## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

TELESIA L.S.,[1]

        Plaintiff,

v.                                 ACTION NO. 2:21cv666

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Telesia S. filed this action for review of a decision by the Commissioner ("Commissioner") of the Social Security Administration denying her claim for a period of disability and disability insurance benefits and Supplemental Security Income benefits under Titles II and XVI of the Social Security Act. *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

An order of reference assigned this matter to the undersigned. ECF No. 10. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is recommended that plaintiff's motion for summary judgment (ECF No. 12) be **DENIED**, and the Commissioner's motion for summary judgment (ECF No. 13) be **GRANTED**.

---

[1] In accordance with a committee recommendation of the Judicial Conference, plaintiff's last name has been redacted for privacy reasons. Comm. on Ct. Admin. & Case Mgmt. Jud. Conf. U.S., Privacy Concern Regarding Social Security and Immigration Opinions 3 (2018).

## I.    PROCEDURAL BACKGROUND

Telesia S. ("plaintiff") protectively filed applications for benefits on January 16, 2017, alleging disability beginning on December 15, 2016, due to sciatica, back problems, and a herniated disc. R. 80, 174–75, 184, 284–304.[2]  Following the state agency's denial of her claim, both initially and upon reconsideration, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). R. 174–214, 252–53.  ALJ William Pflugrath held a hearing attended by plaintiff and her attorney on November 16, 2018, and issued a decision denying benefits on December 27, 2018. R. 80–91, 125–73.  On November 23, 2019, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  R. 12–16.  Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review.  *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

Having exhausted administrative remedies, plaintiff, now acting in a *pro se* capacity, filed a complaint on December 28, 2021.  ECF No. 3.  The Commissioner answered on March 22, 2022. ECF No. 8.  In response to the Court's order, plaintiff and the Commissioner filed motions for summary judgment on April 19 and May 18, 2022, respectively.  ECF Nos. 12–13.  The Commissioner filed a supporting memorandum with its motion, ECF No. 14, and plaintiff attached over 30 pages of medical records to her letter filing, ECF No. 12, at 9–40.  By letter to the Court filed on July 14, 2022, plaintiff requested more time to reply to the Commissioner's brief and to enable her to gather evidence and to seek an attorney.  ECF No. 16, at 1.  The Court construed plaintiff's letter, which included additional information about her conditions and treatments, as a motion to extend time and granted plaintiff's request to file a reply, not later than August 5, 2022.

---

[2] Page citations are to the administrative record that the Commissioner previously filed with the Court.

ECF No. 17. Plaintiff did not do so. As oral argument is unnecessary, this matter is ready for a decision.

## II.     RELEVANT FACTUAL BACKGROUND

### A.    *Background Information and Hearing Testimony by Plaintiff*

During the hearing before the ALJ on November 16, 2018, plaintiff provided the following information. At that time, the 32-year-old plaintiff was pregnant and lived in a two-story apartment with her "very active" 4-year-old son. R. 130–32, 156–57, 160–161. Plaintiff most recently worked in 2016 as aide at a group home for mentally challenged persons and assisted them with various activities, including bathing, dressing, lifting, and attending to their daily needs. R. 140–42. Due to health problems, the physical nature of this work, and after her neurologist advised she could no longer meet the physical demands of the job, plaintiff initially took leave pursuant to the Family Medical and Leave Act ("FMLA"), and later stopped working entirely. R. 142–43, 326 (ceasing work on December 14, 2016). Before that, plaintiff also worked as a clerk for a collection agency, interacting by telephone with debtors. R. 138–40.

In 2017 and 2018, and to earn some limited income to support her family, plaintiff performed some hairdressing "on the side" for family and friends. R. 135–37; *see also* R. 129. Also, after stopping work and continuing to the date of hearing, plaintiff took classes with Centura College while pursuing a bachelor's degree in health information management. R. 133. Plaintiff obtained an associate's degree in health information technology, with honors, shortly before the ALJ hearing. R. 133–34; *see* R. 153–54 (noting she attends school two days per week and that the school accommodates her conditions); ECF No. 12, at 3 (describing accommodations, as including special chair and sit/stand option).

Plaintiff described suffering from severe pain that, among other things: (a) limits her to

3

standing for more than ten minutes; (b) interferes with her ability to sleep, sometimes for as little as four hours; (c) affects her ability to sit for longer than ten minutes by forcing her to frequently shift positions; (d) limits her ability to drive, other than as needed for treatment; and (e) precludes her from working and performing household chores. R. 144; *cf.* R. 152 (stating that pain "limits," but does not necessarily prevent her from performing "any" activities). Plaintiff underwent back surgery in December 2016, when the condition began to affect her bladder control, as well as left knee surgery in April 2017. R. 145. Following these surgeries, her back condition improved some, *id.*, and she managed it with massage and ice treatments, R. 161. She reportedly needs, however, additional surgeries on her spine and foot, that were postponed due to pregnancy. R. 160 (discussing spinal stimulator implant).

Plaintiff ambulated with a rolling walker at the hearing, due to difficulties with walking and standing. R. 146–48 (describing falls, as recently as two weeks earlier, following excessive standing and loss of feeling in her legs). While regularly using the walker since early 2018, plaintiff walks without it at times by "holding [her] hip" and depressing a pressure point to ward off spasms. R. 147–48. She also does not use a walker when moving around the upstairs bedrooms and bathroom of her apartment. R. 161–62.

Plaintiff also reported receiving treatment for anxiety and depression during the year before the hearing. R. 157. She attributed these conditions to her back problems and reported taking Zoloft, after discontinuing with Risperidone due to "bad side effects." R. 158.

Plaintiff has a "high tolerance to pain," due to the need to care for her child. R. 150. She reported that she: (a) bathes her child; (b) shoots baskets and gets on the floor to do arts and crafts with him; (c) performs some housework, such as cleaning dishes and sweeping, and manages such tasks by taking breaks as needed; (d) does homework; (e) avoids bending and lifting items over 10

pounds; (f) goes up and down the stairs at her apartment a couple of times a day to use the bathroom and to attend to her son's use of the bathroom, as needed; (g) prepares simple meals using the oven or stove; (h) is licensed, drives short distances, including to the store, and uses a handicapped placard to assist with parking.  R. 133, 150–51, 153, 158, 161–62.

Although she takes her son to visit family, plaintiff no longer engages in social activities like walking at the mall and going to the movies or clubs with friends.  R. 157–58.  Plaintiff's father assists her frequently, including by taking her to the store, by taking out the trash, and by carrying laundry and heavy grocery items.  R. 150–52.  Her son also helps her get dressed, by helping plaintiff put on socks and pants.  R. 159.

In a March 31, 2017 pain questionnaire/function report, plaintiff reported lower back, left knee, and right leg pain, and placed check marks describing the pain as "aching," "stabbing," "throbbing," and "cramping."  R. 335–36.  This pain occurs "periodically all through the day" and results from prolonged sitting and standing, and lifting and bending.  R. 335.  The pain keeps her from bending, stooping, squatting, reaching, standing, or sitting, and she reported having "knee pops" and a left knee that "gives out."  R. 336.  She reported that pain limited her activities until she underwent back surgery on December 23, 2016, and that she finds relief with compresses and daily medication.  *Id.*

In an April 3, 2017 function report, plaintiff described her daily activities as including getting her son ready for and picking him up from day care, going to physical therapy, running errands as needed, exercising at the gym, making dinner, and playing with her son and getting him ready for bed.  R. 340, 344, 347.  She reported preparing meals, but that doing so took longer (2.5 hours), due to the need to sit while doing so.  R. 342.  She also reported cleaning, vacuuming, mopping, and washing clothes, on a daily basis, doing a "little at a time with breaks."  R. 342

5

(noting that doing laundry was painful).  Plaintiff said that she drives and goes outside every day, including on shopping trips that she shortened to try to avoid having spasms.  R. 343.  She described her ability to engage in hobbies, such as playing with her son, going to amusement parks and pools, and bowling, was now limited.  R. 344 (noting pain with getting down and up from the floor).

Plaintiff checked boxes indicating that her conditions diminished her abilities to lift, squat, bend, stand, walk, sit, kneel, climb stairs, and complete tasks.  R. 345.  For example, she noted that she could lift up to 15 pounds, walk short distances, and climb stairs on a limited basis.  *Id.*  (noting ability to walk 300–500 feet before needing to stop and rest).  Plaintiff manages her own finances, but has difficulties paying bills due to limited resources.  R. 343.  Plaintiff reported no problems in paying attention, following written and spoken instructions, getting along with others, and in handling stress and changes in routine.  R. 345–46.  Finally, plaintiff reported using a prescribed walker, as well as a cane and a brace/splint, "after doing chores [and] laundry" and to assist "with getting out of bed."  *Id.*

Plaintiff updated this information on May 18, 2017, and reported having knee surgery on April 20, 2017, continuing to have "severe back pain," and attending physical therapy three times a week.  R. 351, 358.  On October 16, 2017, plaintiff reported worsening symptoms and "[p]ermanent nerve damage."  R. 365.  Finally, in May 2018, plaintiff advised that her treating physician, Dr. Alesia Griffin, described her remaining treatment option as a spinal stimulator.  R. 389; *see* R. 382.

**B.    *Hearing Testimony by Vocational Expert***

Robert Edwards, a vocational expert ("VE"), also testified at the hearing.  R. 143, 165–70.  Based upon the ALJ's hypothetical, VE Edwards opined that a claimant of plaintiff's age,

education, work history, and RFC could perform plaintiff's past relevant work as a delinquent accounts collection clerk, both as actually and generally performed.[3]  R. 166–68.  VE Edwards also opined that such a claimant could also work as a telephone order clerk, a callout operator, and an addressing clerk, which jobs existed in the national economy in significant numbers.  R. 168.  VE Edwards testified that a claimant would be unable to work in the foregoing positions if "she had to walk assisted with a walker for stability," if she would have two or more unexcused absences per month, and if she would be off task 15% or more of the time.  R. 168–69.

## C.   Relevant Medical Record

### 1.   Treatment with Atlantic Orthopaedic Specialists

Beginning on August 3, 2016 and continuing through October 9, 2018, plaintiff received treatment at Atlantic Orthopaedics Specialists.  R. 401, 695.  On her first visit, Dr. David Clifford treated plaintiff for complaints of back and left knee pain and associated spasms and swelling, apparently resulting from a 2015 fall down a flight of stairs.  R. 404, 409.  Plaintiff advised that severe pain interfered with her bowel control and was most intense upon waking, exertion, and driving.  Id.  A neurologic exam yielded normal findings.  R. 404.  When Dr. Clifford recommended a rectal exam, plaintiff declined and stated that she had bowel control, but simply

---

[3] The first hypothetical involved a claimant of plaintiff's age, education, and work experience, who could perform sedentary work, subject to limitations that:

> She could only frequently balance.  She could only occasionally climb stairs, stoop, kneel, crouch, and crawl.  She should never climb ladders.   She should have no more than frequent exposure to vibration or exposure to workplace hazards . . . .

> She could frequently but not always twist the lumbar spine or the lower back.  She must be allowed to alternate between sitting and standing positions while at a workstation . . . occasionally.

R. 167–68.

7

failed to make it to a bathroom in time.  *Id.*  Dr. Clifford recommended an MRI of the lumbar spine to rule out cauda equina syndrome.  R. 405.

After having an MRI on August 17, 2016, plaintiff returned to see Dr. Clifford on August 23, 2016.  R. 402–03, 407–08.  Dr. Clifford noted that the MRI showed "degenerative changes at L3-4, L4-5 and L5-S1 with disc herniations and extrusions at three different levels" and diagnosed lumbar radiculopathy and degenerative disc disease.  R. 402–03.  Dr. Clifford suggested injections for pain relief and plaintiff declined as prior, like treatment provided no relief.  R. 403.  Dr. Clifford referred her to pain management and recommended against surgical intervention.  *Id.*

On September 25, 2018, plaintiff returned to seek treatment for her right hip from Dr. Paul Warren.  R. 697.  Because plaintiff was two months pregnant, Dr. Warren requested that her OB-GYN advise about whether she could undergo x-rays, cortisone injections, and take anti-inflammatory medications.  *Id.*

Plaintiff returned to see Dr. Warren on October 9, 2018, after obtaining a letter from her OB-GYN authorizing steroid injections and recommending against x-rays.  R. 695.  Treatment notes indicate that plaintiff had spinal surgery in 2016 and now sought treatment for "some discomfort . . . on the lateral side of her right hip area."  *Id.*  (noting also no lower extremity numbness or "weakness issues").  An examination revealed that plaintiff walked without a limp, experienced no groin pain with flexion, extension, or rotation, and showed tenderness over the greater trochanteric region.  *Id.*  Dr. Warren assessed greater trochanteric bursitis and some IT band inflammation and treated plaintiff with a cortisone injection.  R. 696.

### 2.    *Treatment with Neurosurgical Associates and Sentara Health*

On October 3, 2016, plaintiff received a consultation from Dr. Tina Rodrigue at Neurosurgical Associates for complaints of chronic right hip and buttock pain that radiated to her

foot. R. 453. Plaintiff stated she had difficulty bending and lifting and arising from a seated position and that pain sometimes interfered with her ability to care for her child. *Id.* During a review of systems, plaintiff reported tingling, joint pain, and muscle aches. R. 454. During a physical exam, plaintiff exhibited normal gait, normal motor strength, normal muscle bulk/tone and a neurologic exam also yielded normal results.[4] R. 454–55. Dr. Rodrigue reviewed plaintiff's August 2016 MRI results and noted multilevel disc herniations at L3-S1, that the L4-5 disc extrusion may impinge on the L5 nerve root, and mild discogenic inflammation at L5-S1. R. 455. Due to the size of the herniation and plaintiff's continued radicular pain on conservative treatment, Dr. Rodrigue recommended surgery to effect a "unilateral decompression at L4-5 and L5-S1," and after review of treatment options and surgical risks, plaintiff agreed to the procedure. *Id.*; *see* R. 451, 455 (describing lumbar discectomy to remove some bone from the back of the spine to access herniated/bulging disk material to provide room for the nerves and/or relieve a "'pinched nerve'").

On December 23, 2016, Dr. Rodrigue performed a lumbar posterior discectomy/laminectomy at Sentara Norfolk General Hospital. R. 536–37, 542. Dr. Rodrigue performed a hemilaminectomy and medial facetectomy at levels L5-S1 and L4-5, and an aggressive foraminotomy at L5-S1. R. 540. Dr. Rodrigue found no significant disc herniation at L5-S1, but a sizable central disc herniation at L4-5, which she treated by incising the annulus and removing multiple degenerated fragments. *Id.* This allowed for "excellent decompression of the thecal sac and nerve root." *Id.* Dr. Rodrigue's postoperative diagnosis was "[r]ight L4-L5 and L5-S1 herniated nucleus pulposus and foraminal stenosis." R. 539. Notes reflect that plaintiff "had an uncomplicated procedure and an uneventful postoperative course." R. 537. Following

---

[4] A follow-up visit on December 20, 2016, three days before scheduled surgery, yielded the same results and findings. R. 447–49.

surgery and prior to discharge, plaintiff engaged in physical therapy at the hospital with a rolling walker on December 24, 2016 and was issued a referral for home health transitional care with short-term physical therapy. R. 540–42.

On February 1, 2017, plaintiff had a postoperative follow-up appointment with Dr. Rodrigue. R. 445–46. Plaintiff complained of "some chronic pain" and Dr. Rodrigue observed that it was "unclear" whether surgery had improved her condition. R. 445. A physical exam revealed normal findings, including for gait and motor strength, and a neurologic exam also resulted in normal findings. R. 446. Dr. Rodrigue continued her prior diagnosis of osteoarthritis of the spine with radiculopathy, lumbar region, and referred plaintiff to physical therapy. *Id.*

On March 29, 2017, plaintiff again saw Dr. Rodrigue and reported "significant improvement" in her chronic pain, but indicated continued numbness in her right leg, which occasionally "gives out on her." R. 443. A physical and neurologic exam yielded the same results as on the prior visit. R. 443–44. Noting plaintiff's improved back and radicular pain, Dr. Rodrigue advised that plaintiff could increase activities subject to her ability to tolerate them and "discussed permanent restrictions on bending and lifting." R. 444.

On June 12, 2017, physician's assistant ("PA") Bridget Mazzoni treated plaintiff. R. 622–26. Plaintiff complained of chronic right buttock/hip pain, radiating to her knee, but without numbness, tingling, or incontinence. R. 622. A physical exam yielded mostly normal results, including for strength and flexion, except for right-side tenderness at the sacroiliac joint and a positive straight leg test on the right side. R. 625. PA Mazzoni diagnosed chronic, bilateral low-back pain with right-sided sciatica, and sacroiliac pain. R. 626. She ordered an MRI and other studies to evaluate plaintiff's condition, along with injections and continued stretching and home exercise, pending treatment by pain management providers. *Id.* (also denying plaintiff's request

10

for pain medications, noting current prescriptions for tramadol and Percocet from other providers).

After having an MRI and x-rays, plaintiff returned to see Dr. Rodrigue on July 19, 2017. R. 616–20. Dr. Rodrigue reviewed the studies and noted, in comparison to the August 2016 MRI: (a) a smaller central disc extrusion at L4-5, with no nerve impingement; (b) a smaller disc protrusion at L5-S1, with no nerve impingement; (c) a slight decrease in the size of the right foraminal disc protrusion at L5-S1, without nerve impingement; (d) an epidural fibrosis surrounding the right S1 nerve root and posterior to the L5 nerve root; (e) a new right L4-5 foraminal protrusion, but without nerve impingement; and (f) similar disc herniations at L3-L4. R. 620. Plaintiff reported similar problems as on her last visit, and also reported spasms around her right thigh and occasional sharp pain in the right hip/buttock area. R. 616. The results of a physical examination remained the same as on plaintiff's last visit. R. 619. Plaintiff reported receiving pain management treatment and injections, with some temporary improvement, but also said she could not continue to live with the pain. R. 616. Dr. Rodrigue recommended against further surgery and fusion and noted that she intended to recommend epidural stimulation to plaintiff's pain management provider. R. 620.

One year later, Dr. Rodrigue treated plaintiff on July 2, 2018. R. 610–15. Plaintiff said that she remained in constant pain with similar symptoms. R. 610. She had undergone dry needling for possible piriformis syndrome and had begun to use a walker due to pain when walking. *Id.* Dr. Rodrigue's exam findings remained the same as those previously observed. R. 613–14. She continued to recommend against further surgical intervention and observed that the pain seemed to be centered around plaintiff's right trochanter. R. 615. Dr. Rodrigue ordered an EMG to test for radiculopathy, notwithstanding an apparent lack of such symptoms, and indicated that further inquiry into plaintiff's hip may be needed. *Id.* Dr. Rodrigue noted that she did not

11

expect plaintiff to "improve significantly" and expected continuing future problems. *Id.*

Dr. Rodrigue next treated plaintiff on July 30, 2018, and noted that she did not use a walker during this visit. R. 603, 608. Her findings and plaintiff's complaints were the same as previously reported, although Dr. Rodrigue noted that plaintiff reported improvement in pain when walking by pressing in on her right, lateral buttock. R. 606–07. Dr. Rodrigue found the EMG test results for plaintiff's lower extremities to be "stone cold normal." R. 608. Dr. Rodrigue referred plaintiff to an orthopedist for a thorough hip evaluation. R. 603, 608.

### 3. *Treatment with Sentara Physical Therapy*

After failing to show for two appointments in February 2017, on March 7, 2017, plaintiff began physical therapy at the Sentara Therapy Center. R. 529–31. During the assessment, plaintiff reporting having fallen down a stairway four years ago, surgery for "'4 ruptured discs and later may have to put rods in,'" and reported having less, but continuing, severe pain (mostly on the right side) post-surgery that limited her ability to exercise, drive, and sit for long. R. 530 (noting plaintiff's fear of activity after the surgery). Plaintiff rated her pain as ranging from 4 to 10 (on a 0-10 scale), concentrated in her right hip and gluteal region and radiating to the toes in her right foot, with associated numbness and tingling. R. 530–31. The therapist described plaintiff's prognosis as "good" and her functioning as independent with limitations in sitting, standing, walking, driving, lifting, sleeping, and in performing chores and other activities of daily living. R. 530–31.

Plaintiff had seven more physical therapy sessions in March 2017. R. 528–29. As of March 29, 2017, plaintiff had met short-term therapy goals of starting a home exercise program, demonstrating an understanding of her conditions and management strategies, demonstrating appropriate posture and body mechanics to facilitate healing and movement, and in reporting

decreased pain (no more than 3 out of 10) when doing laundry.  R. 528.

Plaintiff briefly stopped therapy to undergo knee surgery, but then resumed with approximately eight more sessions in April and May 2017.  R. 516, 524–26.  On May 11, 2017, the therapist found that plaintiff exhibited increased pain and slight strength deficits due to the absence for knee surgery, but predicted a positive response renewed therapy.  R. 524–25.  At that time, plaintiff reported pain ranging from 5 to 10, increased stiffness and constant sharp, stabbing pains, but without radiation into her toes.  R. 525.  In assessing plaintiff's long-term therapy goals, the therapist noted that plaintiff:  (a) had yet to meet the goal of sleeping 6–8 hours per night without pain medicine; (b) had met the goal of increased lumbar active range of movement within defined limits such that she could pick up light objects from the floor and get into and out of the car with pain at less than 3 out of 10; (c) had met the goal of increased sitting tolerance of at least 30–60 minutes and could drive to appointments, in spite of plaintiff's complaint of pain afterwards; (d) partially met the goal of cleaning her home with pain rated at 2–3 out of 10, by doing so with breaks; (e) had not met the goal of increasing her self-assessed functional performance score by 15 points.  R. 524 (noting goal to increase right lower extremity strength to permit squatting and lifting of laundry basket).

On May 31, 2017, plaintiff decided to discontinue further therapy.  R. 516.  Plaintiff complained of pain at level 9 in the right hip and buttock, which limited her ability exercise.  R. 517–18.  The therapist assessed plaintiff's overall improvement as "fair," that her symptoms had decreased, and she had a fair tolerance for activity.  R. 517.

### 4.    *Treatment with Atlantic Care Associates*

Plaintiff also received primary care medical treatment from Dr. Alesia Griffin at Atlantic Care Associates on December 5, 2016 and March 14, 2017.  R. 434–36.  On March 14, 2017, Dr.

Griffin evaluated plaintiff for knee pain. R. 434. Plaintiff advised that the pain dated back four years and currently involved aching, swelling, crepitation, and her knee giving out. *Id.* Plaintiff reported having been told years earlier that she had a meniscal tear, but instead focused on treating on her back, which was improving following a recent surgery. *Id.* During a review of systems, plaintiff reported being positive for arthralgias, but denied back or limb pain, joint stiffness, or myalgias. *Id.* A physical exam yielded mostly normal findings (other than anterior pain to palpitation), including a normal gait, a full and active range of motion, and no gross edema or evidence of acute injury to the left knee. *Id.*

Dr. Griffin's records reflect that on March 29, 2017, plaintiff had an MRI on her lower left extremity. R. 412–13. The radiologist's impressions were:

> 1. Low intensity, full-thickness fissure involving the trochlear sulcus with prominent subchondral cystic change and marrow edema like signal involving the subjacent trochlea. This is likely sequela of previous trauma.
>
> 2. Two tiny cystic structures are present along the posterior body/posterior horn junction of the medial meniscus, nonspecific. Findings may represent paramenical cysts or ganglion cysts. No discrete meniscal tears are present.
>
> 3. Otherwise, no acute abnormalities.

R. 413.

### 5.    *Treatment with the Sports Medicine & Orthopaedic Center*

On April 5, 2017, plaintiff sought treatment for her left knee problems from Dr. Michael Romash with the Sports Medicine & Orthopaedic Center. R. 467–69. During a review of symptoms, plaintiff denied, among other things, having arthralgias, back pain, myalgias, anxiety, depression, or sleep disturbances. R. 467. A knee examination revealed an antalgic gait, full range of movement, no effusion, no pain with patellar compression and flexion, knee stability, little to no joint line tenderness, and localized pain in the medial parapatellar region and where the quad

tendon attached to the patella. R. 468. After the exam and review of the MRI, Dr. Romash noted the absence of meniscus tears, the presence of small parameniscal cysts, the absence of significant symptoms in the area of the medial meniscus, the presence of a "moderately large [osteochondritis] in the trochlea" but without symptoms, and pain in the area of the plica and along the distal quad tendon. R. 468–69. As to the latter finding, Dr. Romash recommended minimally invasive arthroscopic surgery. R. 469; *see* R. 468 (assessing left knee pain, plica knee, and knee tendonitis).

On April 20, 2017, Dr. Romash performed a left knee arthroscopy on plaintiff to remove the suprapatellar and medial plica, debride the quad tendon, and to evaluate for the trochlea osteochondritis. R. 461, 464, 489–90.

On May 8, 2017, plaintiff returned to see Dr. Romash for a postoperative appointment to remove her sutures. R. 461. Plaintiff reported little improvement, but was also described as "overall better than she was before surgery." *Id.*

On June 5, 2017, Dr. Romash noted that plaintiff's "[c]ourse since surgery has been notable for increased pain," of a moderate, non-radiating, and intermittent nature located at the medial and superior knee cap. R. 458 (also describing pain as "sharp" and "throbbing" and relieved with rest). Plaintiff reported that bending and walking great distances increased the pain. *Id.* A physical exam revealed that plaintiff's back, neck, and upper extremities were all "normal," that her knee had "minimal effusion," but was tender to patellar compression, and had a range of movement of 0-110 degrees, with patella crepitance. R. 459. Noting that the surgery revealed a "full thickness cleft" of the trochlea, Dr. Romash directed plaintiff to stop therapy and provided her information on a mosaicplasty. R. 460–61; *see* R. 489 (noting "a medial longitudinal cleft in the articular cartilage of the trochlea . . . [that] went down full thickness through cartilage and . . . probably penetrated the bone below").

During a July 24, 2017 visit with Dr. Romash, plaintiff's condition and the physical findings remained mostly the same and, after discussion of the risks, plaintiff agreed to have a mosaicplasty. R. 599–600. Notes from September 6, 2017 reflect that plaintiff's insurance company wanted more information before approving any surgery. R. 595. Dr. Romash's notes report that plaintiff had a failed arthroscopy and micro fracture and had "a full thickness cleft into the trochlea with severe changes of the trochlea on MRI." *Id*. Although reporting new, mild pain on the posterior aspect of her knee that was relieved by rest, during a review of symptoms plaintiff denied having arthralgias, back pain, and myalgias, and a physical exam also identified her neck, back, and upper extremities as normal. R. 595–96 (noting increasing discomfort upon bending over and "walking great distances").

Treatment notes from November 15, 2017 reflect that plaintiff's insurer denied an appeal for a second knee surgery. R. 592. To treat plaintiff's increasing, but non-radiating pain, and decreasing function and walking ability, Dr. Romash gave her a knee injection and prescribed a refill of Percocet. R. 592–94. A review of systems and physical exam results were unchanged from the prior visit. R. 592–93. When next seen on December 18, 2017, plaintiff said the injection provided "very short term relief." R. 589. A review of systems and physical exam yielded the same results as before. R. 589–90. Dr. Romash's diagnoses were left knee pain, plica knee, and patellar chondromalacia. R. 591. On February 14, 2018, Dr. Romash provided another therapeutic knee injection. R. 585–87.

Following a car accident in which she rear-ended a pickup truck, plaintiff next saw Dr. Romash on June 7, 2018, and complained of pain in her left knee and right ankle and reported taking analgesics for back pain with radiculopathy. R. 581 (noting plaintiff reported an injury to her right foot as a child, with increasing pain and deformity over time, that now makes walking

16

very painful). A review of systems remained the same as previously reported. R. 581. A physical exam revealed an antalgic gait, that plaintiff's limbs were sensate and without neuropathy, and reviewed plaintiff's left knee (no effusion, tenderness noted, stable, with mild crepitance), and right ankle. R. 582–83. After x-rays of the left knee and ankles, Dr. Romash added diagnoses for ankle pain, subtalar arthritis, and an Achilles tendon contracture. R. 583.

On July 16, 2018, plaintiff obtained an Evo Quatro brace for her right ankle from Dr. Romash's office. R. 579–80. A physical exam revealed plaintiff's back, neck, and upper extremities were normal, and that her limbs were sensate and without neuropathy. R. 579.

### 6.     *Treatment with Hampton Roads Community Health Center and Sentara Comprehensive Pain Management Center*

On June 21 and 28, 2017, plaintiff received care from Dr. Vladimir Markovic at the Hampton Roads Community Health Center and sought pain management referral. R. 471–76, 474–75. Plaintiff reported having chronic back and left knee pain stemming from an injury four years earlier. R. 474. She reported an inability to sit for more than 5-10 minutes without needing to get up, having intermittent leg weakness, that laying down increases the pain, and struggling with activities of daily living. R. 474. A physical exam revealed low back pain upon palpitation and movement, and left knee pain upon palpitation and against resistance. R. 474–75. Dr. Markovic issue a one-time prescription for Percocet and referred plaintiff for pain management. R. 475.

From May 2017 through May 2018, plaintiff received treatment from Dr. Maria Nguyen (a specialist in interventional pain management) and Dr. George Lin (a specialist in physical medicine and rehabilitation) at the Sentara Comprehensive Pain Management Center. R. 507–12, 652, 670–78. Plaintiff initially treated with Dr. Lin on May 30, 2017. R. 518–22. Plaintiff complained of constant, severe low back pain (ranging from level 8 to 10) that radiated to her left

calf, as well as anxiety and depression. R. 519–20. Dr. Lin's exam revealed, among other things, a mildly antalgic gait on the right side, tender lower lumbar paraspinal muscles, normal lower limb strength, muscle tone, neurological findings, and passive hip range of motion, limited lumbar range of motion, a positive right straight leg test, an equivocal lumbar facet loading test, and a normal mood and affect. R. 520–21. Dr. Lin noted that conservative treatment, including physical therapy, a home exercise program, medications, and rest, had "failed." R. 519. He directed plaintiff to stop taking Mobic and Flexeril, prescribed gabapentin and norflex, and told her to begin taking acetaminophen and continue with motrin. *Id.* Dr. Lin also discussed the negative side effects of opioids and directed plaintiff to speak with Dr. Griffin about discontinuing tramadol and Percocet. *Id.* Finally, he referred plaintiff to aquatic therapy, directed continued home exercise, regular aerobic activity, use of ice, rest, and encouraged dietary change and weight loss. *Id.*

Dr. Lin referred plaintiff to Dr. Nguyen, who twice performed sacroiliac joint steroid injections in July 2017, R. 492–95, 501–07, and twice performed epidural lumbar injections in October 2017, R. 681–91.

Before providing the injections, Dr. Nguyen evaluated plaintiff on June 22, 2017. R. 507–12. Plaintiff again complained of continual low back pain, extending into her right hip, and rated her pain as ranging from level 7 to 10. R. 508; *see* R. 509 (also complaining of depression and anxiety). Plaintiff said that the pain increased with walking, standing, lifting, and bending, and was mitigated by medicine, heat/cold, sitting, lying down, and relaxation. R. 508 (noting current pain medications as motrin, tramadol, gabapentin, and norflex). Dr. Nguyen's musculoskeletal exam showed that plaintiff: (a) had an antalgic gait; (b) was able to toe and heel walk; (c) had decreased range of movement in the lumbar spine; (d) had pain with extension, flexion, and lateral rotations; (e) had lumbar paraspinal muscle tightness and spasms; (f) was negative for lumbar facet

18

loading; (g) was tender on the sacroiliac joint; (h) had no tenderness on the trochanteric bursa; (i) could easily climb onto the exam table; (j) was negative on the straight leg test; and (k) had no pain over the range of movement with her hips. R. 510. Dr. Nguyen's exam also revealed full, lower extremity strength and normal psychiatric findings. *Id.* Dr. Nguyen opined that plaintiff's pain stemmed, in large part, from sacroiliac joint dysfunction and recommended spinal injections. R. 508. The first two injections in July 2017 provided little pain relief; while the October 2017 injections provided "good relief," but only for one month. R. 673; *see* R. 690 (noting "significant improvement of leg pain" after first October 2017 injection).

During an August 11, 2017 visit with Dr. Lin, plaintiff reported having "no significant changes with [her] pain complaints." R. 634. At plaintiff's request, Dr. Lin ordered a wheeled-walker, due to her gait abnormality and radicular, low back pain. R. 635. Dr. Lin directed plaintiff to stop taking motrin and norflex, instructed her how to slowly stop using gabapentin, and prescribed Elavil and Clinoril. R. 634–35.

Plaintiff experienced no improvement by the time she next saw Dr. Lin on December 15, 2017. R. 651–60. In response to her reports of constant, worsening pain, Dr. Lin discontinued Clinoril and Elavil and prescribed Lyrica. R. 653. During a follow-up appointment on December 28, 2017, plaintiff reported worsening pain, which she attributed to increased physical activity, stress, anxiety, and cold weather. R. 664. She apparently sought treatment at the emergency room on December 24, 2017 and had an MRI, which Dr. Lin indicated revealed no new findings about her lumbar spine. *Id.* Dr. Lin prescribed etodolac for pain and an increased intake of Lyrica. R. 664, 669.

Dr. Lin next treated plaintiff on May 9, 2018, at which time plaintiff's diagnoses were listed as chronic bilateral low back pain with right-sided sciatica (primary), protruded lumbar disc,

history of decompressive lumbar laminectomy, neuropathic pain, muscle spasm, myofascial pain, and being "overweight." R. 670.    During this visit, plaintiff reported worsening and, at times, uncontrolled pain, which she attributed to a recent motor vehicle accident. R. 673. Dr. Lin ordered physical therapy two times/week for three weeks in conjunction with a trial of dry needling. R. 672. He also discontinued plaintiff's use of etodolac and prescribed Feldene and baclofen for pain and muscle spasms. *Id.*

### 7.    *State Agency Physician Reviews*

On April 14, 2017, Bert Spetzler, M.D., a state agency consultant, reviewed plaintiff's medical record. R. 178–82, 187–91  Dr. Spetzler assessed that plaintiff:  (1) could, with normal breaks, stand and/or walk roughly 6 hours in an 8-hour workday; (2) could sit for the same time period; (3) could lift 20 pounds occasionally, and 10 pounds frequently; (4) could frequently climb stairs, ramps, ladders, etc., stoop, kneel, crouch, and crawl; (5) had no balance or push/pull limitations; and (6) had no manipulative, visual, environmental, or communicative limitations. R. 179–80. Based upon these exertional and postural limitations, Dr. Spetzler opined that plaintiff could perform a wide range of light work. R. 180, 189.

At the reconsideration level, on September 5, 2017, Richard Surrusco, M.D., reached findings similar to those of Dr. Spetzler. R. 200–03, 211–14. Dr. Surrusco found greater exertional limitations, specifying that plaintiff could stand or walk up to 2 hours and could sit about 6 hours in an 8-hour workday, all with normal breaks. R. 200, 211. He also found that, after her knee surgery in April 2017, that plaintiff was limited to occasional pushing and pulling in her lower left extremity. R. 200–01, 211–12. He also identified greater postural limitations, finding that plaintiff could balance frequently, but only occasionally climb, stoop, kneel, crouch, and crawl. R. 201, 212. Dr. Surrusco also concluded plaintiff retained an RFC for light work. *Id.*

## III.    THE ALJ's DECISION

To evaluate plaintiff's claim of disability,[5] the ALJ followed the five-step analysis set forth

in the SSA's regulations.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).   Specifically, the ALJ

considered whether plaintiff:  (1) was engaged in substantial gainful activity; (2) had a severe

impairment; (3) had an impairment that meets or medically equals a condition within the SSA's

listing of official impairments; (4) had an impairment that prevents her from performing any past

relevant work in light of her RFC; and (5) had an impairment that prevents her from engaging in

any substantial gainful employment. R. 80–91.

The ALJ found that plaintiff met the insured requirements[6] of the Social Security Act

through June 30, 2020, and had not engaged in substantial gainful activity from December 15,

2016, her alleged onset date of disability. R. 82–83.

At steps two and three, the ALJ found that plaintiff had the following severe impairments:

(a) spine disorder; and (b) dysfunction of major joints. R. 83.  The ALJ classified plaintiff's other

impairments as non-severe.  *Id.*  The ALJ further determined that plaintiff's severe impairments,

either singly or in combination (along with her other conditions), failed to meet or medically equal

---

[5] To qualify for DIB, an individual must meet the insured status requirements of the Social Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability benefits, "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a)  To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy. *Id.*

[6] In order to qualify for DIB, an individual must also establish a disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, as required for a finding of disability at step three.[7] R. 83–84.

The ALJ next found that plaintiff possessed an RFC for sedentary work, *see* 20 C.F.R. §§ 404.1567(a), 416.967(a), subject to the limitations that she: (a) "can frequently but not always balance"; (b) "can only occasionally climb stairs, stoop, kneel, or crouch, and crawl," but "never climb ladders"; (c) "can have no more than frequent exposure to vibration, or to workplace hazards"; (d) "can frequently, but not always, twist the lumbar spine or lower back"; and (e) "must be allowed to occasionally alternate between sitting and standing positions while at the workstation." R. 84.

At step four, the ALJ found that plaintiff could resume working as a delinquent accounts collection clerk (sedentary and skilled position). R. 88.

Finally, the ALJ also proceeded to step five, and found, having considered the VE's testimony and plaintiff's age, education, work experience, and RFC, that she could perform other jobs available in the national economy, such as a telephone order clerk, a call out operator, and an addressing clerk. R. 89–90.

Accordingly, the ALJ concluded plaintiff was not disabled from December 15, 2016 through December 27, 2018 and was ineligible for disability benefits or Supplemental Security Income. R. 90.

---

[7] This determination was consistent with the position taken at the hearing by plaintiff's counsel, who conceded she was not arguing that a listing had been met. R. 130.

## IV.   STANDARD OF REVIEW

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits.  42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (noting the substantial evidence standard is "more than a mere scintilla," but "is not high").

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner.  *Craig*, 76 F.3d at 589.  "'Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ).'"  *Id.* at 589 (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)).  The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law.  *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)).  Thus, reversing the denial of benefits is appropriate only if either (a) the record is devoid of substantial evidence supporting the ALJ's determination, or (b) the ALJ made an error of law.  *Id.*

## V.   ANALYSIS

As plaintiff is a *pro se* litigant, the Court liberally construes her filings to identify her claims. *See United States v. Gholson*, 33 F. App'x 80, 81 (4th Cir. 2002) (observing that courts "must liberally construe the claims of pro se litigants" (citing *Boag v. MacDougall*, 454 U.S. 364, 365 (1982))).  Plaintiff argues that:  (a) her physical and mental impairments leave her unable to perform substantial gainful activity and that substantial evidence fails to support the ALJ's finding that she retains a residual functional capacity ("RFC") for a limited range of sedentary work; and (b) her treatment history after the ALJ's decision necessitates a remand.  ECF No. 12, at 2–7; ECF No. 16, at 2–7.

### A.    *Substantial evidence supports the ALJ's assessment of plaintiff's residual functional capacity.*

Plaintiff seeks a remand arguing that she is unable to work and that the ALJ erred in assigning an RFC for sedentary work. ECF No. 12, at 3; ECF No. 16, at 3–4, 6. Plaintiff contends that the ALJ ignored the evidence of record and questioned her at the hearing about irrelevant matters, such as hairdressing, childrearing, and educational pursuits/student loans, rather than focusing upon her deteriorating physical and mental state.  ECF No. 12, at 4–7.  As neither surgeries nor therapy nor medication-based remedies have enabled her to manage her pain and mental health, plaintiff argues that she cannot work due to pain and related difficulties in walking, standing, and sitting. *Id.* at 4–5, 7; ECF No. 16, at 3–5.

The Commissioner argues that the ALJ's RFC determination is well-supported.  Mem. Supp. Def.'s Mot. Summ. J. and Opp. Pl.'s Mot. Summ. J. ("Def.'s Mem."), ECF No. 14, at 21–27.  The Commissioner asserts that the medical evidence of record shows plaintiff remains able to perform a reduced range of sedentary work, notwithstanding her back and knee conditions. *Id.* at 22–23.  The Commissioner contends that this conclusion finds support in plaintiff's post-surgery

back improvement, including favorable neurological and musculoskeletal findings in the months after surgery, her denials of back pain, post-surgery MRI and EMG results, and in plaintiff's activities of daily living. *Id.* at 22–24. Similarly, the Commissioner contends that, following knee surgery, plaintiff exhibited only mild to moderate symptoms, a stable knee, full lower extremity strength, and, at most, a mild to moderately antalgic gait. *Id.* at 23. Finally, the Commissioner contends that the ALJ properly classified plaintiff's mental health concerns as non-severe impairments, due to the absence of significant complaints and symptomology and numerous normal mental status findings during exams in the relevant period. *Id.* at 26–27.

As part of the five-step sequential analysis, an ALJ must determine a claimant's RFC. *See* 20 C.F.R. §§ 404.1545, 416.945. This determination "is an agency-conducted administrative assessment that considers all relevant" medical and other evidence. *Caulkins v. Kijakazi*, No. 20-1060, 2022 WL 1768856, at *5 (4th Cir. June 1, 2022) (citing 20 C.F.R. § 416.945(a)(3)); *see also* 20 C.F.R. §§ 404.1545(a)(3), 404.1546(c)).[8] The RFC describes "the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting . . . 8 hours a day, for 5 days a week . . . ." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996). An ALJ must assess a claimant's work-related abilities on a function-by-function basis. *Id.* at *3 (assessing physical, mental, and other abilities to perform work requirements in light of limitations and impairments). After doing so, the ALJ may express the RFC in terms of both exertional levels of work (sedentary, light, medium, heavy, and very heavy) and nonexertional functions supported by the evidence. *Id.* The ALJ then uses the RFC to determine whether the claimant can perform

---

[8] "Other evidence" includes statements or reports from the claimant, the claimant's treating or nontreating sources, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work. 20 C.F.R. §§ 404.1529(a), (c), 416.929(a), (c).

her past relevant work (step four), and whether the claimant can adjust to any other work existing in the national economy (step five). 20 C.F.R. §§ 404.1545(a)(5), 416.945(a)(5).

The ALJ determined that plaintiff maintains an RFC for a reduced range of sedentary work[9], which enables her to perform both past relevant work as a collections clerk or certain other jobs available in the national economy. R. 84–90.   Substantial evidence supports this determination.  The record reflects that, rather than ignoring pertinent evidence or relying upon irrelevant evidence, the ALJ duly considered plaintiff's activities of daily living, the medical evidence of record, plaintiff's testimony and other statements about her conditions and symptoms, and the state agency medical opinions.

As to activities of daily living, the ALJ found that plaintiff's abilities to maintain a home as a mother to a young and active child, her testimony that she remains able to clean, mop, vacuum, and do laundry, and her successful and continuing undergraduate academic endeavors after the alleged onset date, supported a finding that she is able to work, in spite of her impairments. R. 87; *see* R. 130, 150–51, 153, 340, 342, 344.  Plaintiff questions the relevance of inquiry into her hairdressing, schooling, and homemaking activities. ECF No. 12, at 4–7.  The ALJ, however, properly considered:  (a) her academic pursuits in relation to plaintiff's mental abilities and to her ability to work outside the home and walk, sit, and stand during a workday and workweek, R. 133–34, 153–54; *see* ECF No. 12, at 3 (discussing use of sit/stand option at school); (b) her hairdressing relative to whether her income would preclude any claim for benefits and relative to her physical

---

[9] Sedentary work is defined as involving "lifting no more than 10 pounds at a time and occasionally lifting and carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is . . . one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties."  20 C.F.R. § 404.1567(a); *see* 20 C.F.R. § 416.927(a).

abilities to work, R. 87, 129, 135–37; and (c) her homemaking and childcare activities in relation to her physical abilities to sustain work, R. 87, 149–52, 342, 344.

The ALJ also thoroughly reviewed the medical evidence of record, including plaintiff's medical history, signs, and laboratory findings, treatments and their effects, and recorded examinations and observations of plaintiff's conditions. R. 85–88. Based upon such evidence, the ALJ concluded that plaintiff's spine disorder and major joint dysfunction were severe impairments. R. 83, 87. He also found that plaintiff's back condition showed some improvement after her December 2016 surgery. R. 85–86; *see* R. 443, 459, 590, 596, 599. This was evidenced, as noted by the ALJ, in comparing pre-surgical MRI results with those from an August 2017 MRI, which showed "no central stenosis." R. 85–86. Also, the ALJ observed that plaintiff's EMG test results from July 2018 were "normal." R. 86; *see* R. 608, 615 (ordering EMG to test for radiculopathy). Similarly, lumbar spinal x-rays taken in July 2017 showed only mild narrowing of the L5-S1 disc space, without evidence of significant abnormality or of significant instability with flexion or extension. R. 86; *see* R. 568–69.

Further, while noting plaintiff's recurring complaints of sciatica, back and other pain, and her arthroscopic surgery on the left knee in April 2017, the ALJ also reviewed the objective findings of numerous physical exams during the relevant time period. R. 85–87. As noted by the ALJ, plaintiff exhibited with some frequency, among other things: (a) either a normal gait or one that was only mildly to moderately antalgic; (b) good range of motion; (c) normal muscle tone and bulk; (d) full lower extremity motor strength; and (e) a normal back or offered no subjective complaints about her back. R. 85–87; *see* R. 434, 443, 446, 459, 467, 510, 521, 525, 583, 590, 595–96, 599, 603, 606–07, 613–14, 625, 695.

The ALJ also considered plaintiff's testimony and statements about her impairments, symptoms, and limitations, including her reported regular use of a walker, and found them wanting. R. 85–87; R. 87 (describing the same as "not fully consistent with the evidence," and noting that her "symptoms exceed the findings contained in the medical records" and her "testimony is inconsistent with the medical evidence of record").  The inconsistencies identified by the ALJ include plaintiff's significant educational pursuits, her homemaking and other activities of daily living, and the results of the physical exams and the radiologic and test findings described above.  R. 85–87; *see Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 95–96 (4th Cir. 2020) (emphasizing that, upon finding an impairment that might reasonably cause a plaintiff's symptoms of pain, an ALJ may rely solely upon a claimant's statements and subjective and other evidence, apart from objective findings and test results, in evaluating the impact of pain and related symptoms upon a claimant's ability to work).  Although plaintiff appeared with a rolling walker at the hearing and reporting needing and using it regularly for months, the ALJ declined to include a limitation for use of either a walker or cane.  R. 85, 87.  The evidence cited by the ALJ and described above, including plaintiff's presence at appointments walking without a limp or without a walker or using only a crutch, adequately supports this determination.  R. 434, 595, 603, 606–08, 695.

These conclusions are also buttressed by the ALJ's assessment of plaintiff's credibility.  Having observed and heard plaintiff testify, the ALJ found her allegations of disabling impairments at odds with the exam findings of her medical providers, as well as other evidence including plaintiff's educational and other daily activities.  R. 87.  On review, the Court's task does not include second-guessing ALJ credibility assessments.  *See Craig*, 76 F.3d at 589.  Moreover, although her surgeon opined that plaintiff may have approached maximum medical improvement

with her back, R. 615, the record contains no medical opinions that plaintiff's impairments were disabling. To the contrary, after reviewing the evidence the state medical experts opined that plaintiff remained able to perform light work. R. 178–82, 187–91, 200–03, 211–14. Rather than wholly accepting these opinions, the ALJ only partially credited them and adopted an RFC for a reduced range of sedentary work, with a sit/stand option, presumably based, in part, upon testimony by the plaintiff not available to the state agency doctors.[10] R. 84, 87–88.

Finally, the ALJ classified plaintiff's mental health problems, which were identified at the hearing, as non-severe. R. 81, 83, 129, 157–58; *see* 20 C.F.R. §§ 404.1520(c), 416.920(c) (requiring severe impairments); 20 C.F.R. §§ 404.1509, 416.909 (requiring existence of impairment continuously for 12 months); *see also Gross v. Heckler*, 785 F.2d 1163, 1165 (4th Cir. 1986) (noting that conditions and symptoms responding to basic medical attention are not disabling); *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984) (describing a non-severe impairment as a slight abnormality having minimal effect upon one's ability to work). The ALJ decided that these impairments caused no more than minimal functional limitations. R. 83.

Plaintiff argues that the ALJ gave short shrift to her lifelong mental health problems, her deteriorating mental status, and troubles in finding the right combination of medicines to treat the same. ECF No. 12, at 7, ECF No. 16, at 5. However, aside from plaintiff's brief testimony on the subject, R. 157–58, a reference to a Zoloft prescription in July 2, 2018 treatment notes, R. 605, and her isolated reports of depression and anxiety to Drs. Lin and Nguyen on May 30 and June 22,

---

[10] Likewise, the ALJ also implicitly credited some aspects of plaintiff's testimony and also concluded, based upon the testimony of the VE, that plaintiff could not return to her last known employment working as a care aide, due to the physical demands of that job. R. 88, 140–43, 166.

2017, R. 509, 520,[11] the record is otherwise replete with evidence of normal mental status findings, R. 444, 446, 468, 607, 614, 618–19, 625, 637, 646, 656, 666, 675, negative depression screenings, R. 471, 474, the absence of problems performing mental activities, R. 346, the absence of prescriptions for treating mental health, *see, e.g.,* R. 612–13, and the absence of complaints about mental health problems, R. 454, 595.[12] Ample bases, therefore, existed for the ALJ's conclusion that plaintiff's mental health problems during the relevant time period "did not exist for a continuous period of 12 months, were responsive to medication, did not require any significant medical treatment, or did not result in continuous exertional or nonexertional functional limitations." R. 83. The ALJ committed no error in classifying such conditions as non-severe and in finding they caused no "more than minimal functional limitations," without impacting plaintiff's RFC. R. 83–84.

For these reasons, substantial evidence supports the ALJ's determination that plaintiff retained an RFC for a reduced range of sedentary work.

**B.**     ***Additional records of treatment with Dr. Griffin submitted after the hearing and the ALJ's decision do not warrant a remand or cast doubt upon the substantial evidence supporting the ALJ's decision.***

Plaintiff also arguably seeks a remand contending that the Appeals Council erred in rejecting her request for review based upon post-hearing evidence. ECF No. 16, at 5–6. At the hearing, plaintiff's attorney noted her intent to submit additional records showing that Dr. Griffin

---

[11] Even on these occasions, exams by both physicians revealed normal psychiatric findings. R. 510, 520.

[12] Also, as discussed below, plaintiff's counsel apparently did not submit records from the primary care provider relating to mental health care treatment, until after the ALJ issued his ruling. R. 128 (discussing counsel's attempt to procure such records and her recognition that the record, as it then existed, lacked any diagnosis of anxiety). Although the ALJ apparently gave plaintiff the benefit of the doubt, it is unlikely that any medically determinable mental health impairment existed in the absence of such records. *See* 20 C.F.R. §§ 404.1521, 416.921.

prescribed plaintiff medications for anxiety.  R. 128.  By correspondence dated and apparently mailed only one to three days before the ALJ's December 27, 2018 ruling, plaintiff submitted 54 pages of records from her primary care provider at Atlantic Care Associates, among other sources, for the period of June 22, 2017 to August 30, 2018.  R. 20, 91, 97.  As the ALJ's decision contains no reference to these records, it appears that they were not timely received.

Nevertheless, the Appeals Council considered them as part of plaintiff's request for review of the ALJ's decision.  R. 13, 279–81.  The Appeals Council noted plaintiff's obligation to show that such evidence was new, material, related to the period of claimed disability, created a reasonable probability of a different result, and good cause existed for the untimely submission.  R. 13; *see* 20 C.F.R. §§ 404.970(a)(5), (b), 416.1470(a)(5), (b); *see also Meyer v. Astrue*, 662 F.3d 700, 704–05 (4th Cir. 2011).  To be considered "new," the evidence must not be "duplicative or cumulative."  *Wilkins v. Sec'y, Dept. of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (citation omitted).  To be considered "material," there must be "a reasonable possibility that the new evidence would have changed the outcome."  *Id.* (citation omitted).

The Appeals Council denied plaintiff's request for review.  R. 12.  In doing so, it explicitly addressed only one of the above-noted predicates for review.  The Appeals Council concluded that the evidence of additional treatment with Dr. Griffin failed to "show a reasonable probability that it would change the outcome of the decision."  R. 13.

### 1.  *Substantial evidence continues to support the ALJ's decision.*

When, as here, the Appeals Council "denies review, the [ALJ's decision] becomes the final decision."  *Gainforth v. Colvin*, No. 2:15cv205, 2016 WL 3636840, at *8 (E.D. Va. May 9, 2016), *report and recommendation adopted*, 2016 WL 3636621 (E.D. Va. June 29, 2016).  The Court does "not evaluat[e] the Appeals Council's *denial of review*."  *Id.*  Instead, the Court examines

whether, "after considering the additional evidence, substantial evidence still supports the ALJ's decision." *Crowder v. Berryhill*, No. 2:17cv186, 2018 WL 5305089, at *13 (E.D. Va. May 18, 2018), *report and recommendation adopted*, 2018 WL 4565395 (E.D. Va. Sept. 24, 2018); *see also Parham v. Comm'r of Soc. Sec.*, 627 F. App'x 233, 233 (4th Cir. 2015) (per curiam) (citing *Wilkins*, 953 F.2d at 96; also citing *Meyer v. Colvin*, 754 F.3d 251, 257 (4th Cir. 2014)).

Substantial evidence supports the ALJ's determination that plaintiff was not disabled from December 15, 2016 through December 27, 2018, and that she could return to work as a collections clerk or perform certain other sedentary jobs. R. 88–90. The additional evidence shows that Dr. Griffin treated plaintiff on approximately seven occasions from January through August 2018. R. 21, 33, 57, 59, 64, 68, 70. On three of these visits, plaintiff complained of excess stress, anxiety, and/or depression (and associated symptoms). R. 21–22 (January 2), 64 (June 25), 70 (August 30). On each occasion, however, Dr. Griffin's examination yielded generally normal mental status findings, such as a neutral mood, an appropriate affect, the absence of thought disturbances (including hallucinations), memory normal within limits, orientation in all spheres, and normal speech. R. 23, 65–66, 71. The notes also reflect Zoloft prescriptions beginning in March and continuing through August 2018. R. 33, 66, 68, 70. On January 2, 2018, Dr. Griffin diagnosed plaintiff with a major depressive disorder (single episode, mild), and referred plaintiff to a psychotherapist. R. 23. On June 25, 2018, Dr. Griffin diagnosed plaintiff with a generalized anxiety disorder and increased plaintiff's Zoloft dosage from 50 to 100 mg. R. 64–66. Following plaintiff's pregnancy in July 2018, and due to increased anxiety, in August 2018, Dr. Griffin also prescribed buspirone. R. 70–72.

Dr. Griffin's treatment notes also contain findings about plaintiff's gait and the condition of her lumbar spine. R. 23, 58. In both January and March 2018, Dr. Griffin observed that plaintiff

exhibited a normal gait, as shown by her ability to walk, turn, and come back, with her arms at her sides, with "easy" balance, and with the turns being "accomplished smoothly." *Id.* Also, although plaintiff regularly complained of back pain, Dr. Griffin carefully examined plaintiff's lumbar spine during two visits in January and March 2018. R. 22–23, 58. On both occasions, Dr. Griffin found: (a) the lumbar spine to be normal to inspection and palpitation, without swelling or tenderness; (b) in proper alignment; (c) with normal range of motion upon testing; and (d) with full major muscle strength upon testing. *Id.*

This supplemental evidence is insufficient to warrant setting aside the substantial evidence determination noted above. Indeed, the extra evidence about plaintiff's back and walking abilities supports the ALJ's findings described above and his rejection of a limitation for a walker. As to mental health, although the added records corroborate that plaintiff had been taking Zoloft for a somewhat longer time period, they fail to establish the existence of more than the minimal functional limitations found by the ALJ. R. 83. Significantly, although documenting plaintiff's complaints of anxiety and depression, Dr. Griffin's notes also regularly show plaintiff's mental status exams to be normal. R. 23, 65–66, 71. This also supports the ALJ's finding that any such mental health conditions were non-severe because they were well-managed with medication. R. 83. Accordingly, the added evidence fails to undermine the ALJ's conclusion that plaintiff was not disabled.

**C.**   ***The documents attached to plaintiff's summary judgment filing also do not warrant a remand.***

In her first filing responding to the Court's briefing order, *see* ECF No. 11, plaintiff also supplied 31 additional pages of records not otherwise part of the administrative record, *see* ECF No. 12, at 9–40. These records appear to be plaintiff's electronic patient portal summary, pertaining mostly to care with Dr. Griffin at Atlantic Care Associates, but also summarizing other

treatment received by plaintiff. *Id.*; *see id.* at 9, 40 (referencing "MyChart" and "Patient Summary for: [plaintiff]"). Although referencing some medications and diagnoses during the relevant period of plaintiff's claims, the records primarily summarize diagnoses, treatment, and medications prescribed after the period in question and continuing through March 24, 2022.[13] *See id.* at 10–12, 26–31, 33–40. As plaintiff's notes in her filings, ECF No. 12, at 1–2, 4, 7; ECF No. 16, at 5, 7, these new records reflect, among other things, additional back surgeries and/or implants in November 2019 and October 2020, a diagnosis of schizophrenia (unspecified) beginning in February 2021, and a psychiatric referral in March 2021. ECF No. 12, at 26–29, 31, 33–37.

Plaintiff's submission of these new records implicitly suggests that she thinks they are material and justify revisiting her status and ability to work. The Commissioner argues otherwise, contending that they are not part of the administrative record, they post-date the relevant period of review, and that plaintiff cannot satisfy the requisites for a remand based thereon. Def.'s Mem. 27–29.

A district court does not have the power to supplement the record developed before the Commissioner. *Smith v. Chater*, 99 F.3d 635, 638 n.5 (4th Cir. 1996) (citing *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 714–15 (1963)). A court may, however, consider the evidence in the context of a sentence six remand pursuant to 42 U.S.C. § 405(g). Section 405(g) provides:

> The court may, on motion of the Commissioner of Social Security made for good cause shown before the Commissioner files the Commissioner's answer, remand the case to the Commissioner of Social Security for further action by the Commissioner of Social Security, and it may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

---

[13] References in these records to treatment during the relevant time period covered by plaintiff's claims are duplicative of records already contained within the administrative record.

42 U.S.C. § 405(g). Under sentence six, a court "does not rule in any way as to the correctness of the administrative determination." *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991). "Rather, the court remands because new evidence has come to light that was not available to the claimant at the time of the administrative proceeding and that evidence might have changed the outcome of the prior proceeding." *Id.* Remand is appropriate in such a situation because, "[i]n determining whether the ALJ's decision was supported by substantial evidence, a district court cannot consider evidence which was not presented to the ALJ." *Womack v. Astrue*, No. 3:10cv165, 2010 WL 4874935, at *4 (E.D. Va. Oct. 20, 2010) (citing *Smith*, 99 F.3d at 638 n.5).

Accordingly, a sentence six remand is appropriate where (1) the evidence is new, that is, neither cumulative nor duplicative of evidence submitted in a prior proceeding, *see Wilkins*, 953 F.2d at 96; (2) the evidence is relevant to the determination of disability at the time the claimant filed her application and the Commissioner's decision might reasonably have been different had the new evidence been considered; (3) good cause exists for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant has made a general showing of the nature of the new evidence to the reviewing court, *see Finney v. Colvin*, 637 F. App'x 711, 715–16 (4th Cir. 2016); *Campbell v. Astrue*, No. 2:11cv563, 2013 WL 1213057, at *3 (E.D. Va. Mar. 1, 2013). Plaintiff bears the burden of proving these elements. *Campbell*, 2013 WL 1213057, at *3. Further, "[i]n assessing whether the claimant has made these requisite showings . . . '[t]his Court does not find facts or try the case de novo.'" *Finney*, 637 F. App'x at 716 (quoting *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)).

Here, a sentence six remand is unwarranted, notwithstanding that the evidence mostly appears to be new and, as such, could not have been submitted before the ALJ's decision. First, as noted above, the new records mostly pertain to treatments plaintiff received well after the period

of review (December 15, 2016 – December 27, 2018).  Although plaintiff appears to contend that her new and allegedly more serious mental health problems (diagnosis of schizophrenia as of February 2021) date back to childhood, ECF No. 12, at 1–2, ECF No. 16, at 5, the administrative record for the relevant period, including plaintiff's successful efforts pursuing undergraduate degrees, R. 133–34, is at odds with such a claim.  Also, after-the-fact surgical procedures upon plaintiff's back, about which few to no details are provided, are unlikely to shed much light upon her abilities during the relevant time period.  Nor is this a case whether the relevant record lacks robust and timely information about such matters.  For these reasons, the new records have limited bearing upon plaintiff's impairments and abilities during the period in question.  *See Marjorie C. v. Kijakazi*, No. 2:20cv525, 2021 WL 8086731, at *14 (E.D. Va. Oct. 22, 2021) (declining to order sentence six remand based upon records of treatment after the ALJ's decision), *report and recommendation adopted*, 2022 WL 837484 (E.D. Va. Mar. 21, 2022).

Second, to the extent that some of the new records relate to the relevant period of review, they overlap with information already contained in the administrative record.  Granting a remand to review such records again would serve no useful purpose.

Finally, to the extent that plaintiff's conditions and capacities have changed after December 27, 2018, she remains free to file a new application for disability benefits consistent with the alleged onset date of any new impairments.

Accordingly, the Court declines to issue a sentence six remand pursuant to 42 U.S.C. § 405(g).

## VI.   <u>RECOMMENDATION</u>

For the foregoing reasons, this Court recommends that plaintiff's motion for summary judgment (ECF No. 12) be **DENIED**, and the Commissioner's motion for summary judgment

36

(ECF No. 13) be **GRANTED**.

## VII.   REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2. A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
December 22, 2022

37